SMITH *v*. MABERRY.

Opinion delivered January 18, 1896.

SALE OF LAND—LANDLORD'S LIEN.—Where a vendee of land, as part of the purchase price, agrees to pay a debt of the vendor, and at his request executes a note to the creditor reciting that it is given for rent of the land, the creditor is not entitled to a landlord's lien for its payment on crops raised on the land by the vendee.

REPLEVIN—TITLE.—A creditor who takes possession of property of his debtor under an agreement to sell it, and, after paying his debt and the expenses of sale, to deliver the residue to the debtor, has such a right of possession as entitles him to maintain replevin against an officer seizing it under process against the debtor.

APPEAL—OBJECTION NOT RAISED BELOW.—The objection that the record fails to show a judgment and affidavit for appeal from a justice of the peace to the circuit court will not be entertained on appeal from the circuit court where the latter court had original, as well as appellate, jurisdiction of the subject-matter, and exercised such jurisdiction without objection.

Appeal from Logan Circuit Court.

JEPHTHA H. EVANS, Judge.

*D. B. Granger*, for appellant.

1. The mere statement in a note that the consideration is for *rent* does not create a landlord's lien. Calling purchase money *rent* does not create a landlord's lien. 54 Ark. 16; 51 *id*. 218.

2. The sale of the cotton to Smith was complete. 31 Ark. 155 ; 21 Am. & Eng. Enc. Law, p. 514 ; Tiedeman on Sales, sec. 3.

3. There was no abandonment, even if the cotton was delivered to Smith as a mere pledge. 59 Fed. 249 ; 47 Ill. App. 87 ; 18 Am. & Eng. Enc. Law, p. 726, and note 4, etc. ; 18 Fed. 677 ; 57 Iowa, 651.

*S. R. Allen*, for appellee.

BUNN, C. J. Appellant, Smith, brought this suit before a justice of the peace against appellee, as constable, having the custody of a certain bale of cotton, by virtue of a writ of attachment in another suit between Ike Oppenheimer & Co., as plaintiffs, and one J. S. Sanderson, for the sum of fifty dollars alleged to be due as rent, and for which plaintiffs claimed a landlord's lien upon said bale of cotton. In the circuit court the case was tried by the court, by consent, upon the evidence adduced, and the court declared its conclusions on the law and the facts as follows, to-wit: "The plaintiff did not purchase the property in such a way as to pass title. Defendant had no right to hold the property under the landlord's attachment by Oppenheimer, because Oppenheimer had no lien. The plaintiff, by virtue of his contract with Sanderson, acquired a lien, by way of pledge, upon the cotton, but lost his lien as pledgee by abandoning the same to Huey ; and plaintiff does not show his right to possession by a preponderance of the evidence." Upon this the court rendered judgment in favor of the defendant, and the plaintiff excepted, and appealed to this court.

The evidence in the case shows that, a few days before the institution of this suit, plaintiff, Smith, having a debt of fifteen dollars against Sanderson, called to see him for the purpose of collecting the same. In their conversation and negotiation on the subject, it was finally

agreed that Sanderson should sell the cotton in contro-
versy to Smith for the said fifteen dollars, and as much
more as Smith could sell it for in the Paris or home
market.    The cotton was then in the seed.    Smith was
to take it, haul it to the gin, have it ginned and packed,
and then take it to Paris, the county town, put it on the
market, and sell it, and with the proceeds to pay the
expenses of hauling and ginning and packing, the fifteen
dollars, and the residue, if any, over to Sanderson.    All
this was accordingly done, and Smith hired his son to
carry the cotton to market as agreed.    Young Smith
having hauled the cotton to the public square in Paris,
preparatory to offering it for sale on the market, as di-
rected by Smith, Sr., Ike oppenheimer, (one of the firm
of Oppenheimer & Co., the plaintiffs), upon inquiring of
him, ascertained that the cotton was raised by Sander-
son, and thereupon informed young Smith that he had a
lien on it, and threatened to attach it, under his lien, if
young Smith did not or would not turn it over to him.
After some parleying, Ike Oppenheimer proposed to
young Smith that, if he would leave the cotton on the
platform (Adler, Goldman & Co.'s platform), he would
be responsible for it until he could return home and in-
form his father of the condition of things, so that he
(the father) could come in town the following morning ;
and Oppenheimer said he was sure they could arrange it
satisfactorily.    During this coversation, Huey, the busi-
ness manager for Adler, Goldman & Co. in Paris, came
up; and, hearing the proposition of Oppenheimer, told the
young man to leave the cotton on the platform, and he
would be responsible for it until the elder Smith could
come in and arrange the matter with Oppenheimer.
Whereupon the young man, not knowing what else to
do, acted upon the suggestion of Huey, went home, in-
formed his father of the condition of things,    The elder
Smith went to Paris the following morning, and saw and

had a conversation with Oppenheimer on the subject, but they failed to settle the matter, each one claiming the cotton,—Smith upon the ground just stated, and Oppenheimer, upon grounds to be stated hereinafter. A short time after they had separated, Smith learned that Oppenheimer & Co. had attached the cotton, claiming a landlord's lien thereon, which they had claimed when conversing with him on the subject. Smith then instituted this suit against Maberry, the constable, who had served the writ of attachment in favor of Oppenheimer, and held the cotton under and by virtue of the same.

The defendant answered the complaint of Smith, which contained a statement of facts substantially as stated above, as a basis of his claim, and in his answer the constable set forth, and in his testimony showed, the facts upon which Oppenheimer & Co. claimed their landlord's lien and their debt, which are substantially as follows: Ike Oppenheimer testified that he was a member of the firm of Oppenheimer & Co., the plaintiffs in the attachment suit against Sanderson, and that in the fall of 1891, one T. B. Walker was indebted to the firm in the sum of fifty dollars, and was making arrangements to leave the country; that Walker came to the store of Oppenheimer & Co. with Sanderson, and wanted them (Oppenheimer & Co.) to buy his land. This offer not having been accepted, Walker then proposed to rent the land to Oppenheimer, and the latter said they did not wish to rent unless Walker could procure them a tenant, and they said they would rent the land from him (Walker) if he would procure them a tenant. Some days afterwards, Walker went to Oppenheimer & Co.'s store, with a promissory note for fifty dollars, which Sanderson had executed and delivered to him, which he tendered to them in payment of his indebtedness to them,

and the same was accepted as such, they (Oppenheimer & Co.) knowing that he had sold his land to Sanderson.

In his testimony, Sanderson said, he purchased the land from Walker for six hundred dollars, payable as follows, to-wit, $350 to the loan company, which had a mortgage on the land, and $200 to Walker ; that he made a $50 note to Oppenheimer·& Co., which Walker delivered to them as stated, and two notes to Walker of $100 each; that the $50 note was the amount owing to the firm by Walker, and that he (Walker) said that Oppenheimer & Co. wanted a rental note for the amount, and that such was agreed and acted upon ; that he never had any contract with Oppenheimer & Co., or Ike Oppenheimer, to rent the land from them or him, nor with Walker to rent from him ; and that he did not owe them or him, or either of them, for rent of the land, or any part thereof, and never had any conversation with either of them about renting the land."

The $50 note delivered by Walker to Oppenheimer & Co. in payment of his indebtedness as stated, and put in evidence, is as follows, to-wit: "Know all men by these [presents] that I, John Sanderson, promise to pay to Oppenheimer & Co. of Paris, Ark., the sum of fifty dollars with ten per cent interest per annum from date until paid, consideration for said fifty dollars to be rent on the entire farm known as the T. B. Walker farm, situated near Burnett Springs, Logan county, Arkansas. This 9th day of November, 1891. (Signed) John S. Sanderson."

The evidence fails to show that Oppenheimer & Co. were the owners of, or had under control, the Walker farm, or that Sanderson had rented the same, or any portion of it, from them, or from Ike Oppenheimer, or from Walker ; but it does conclusively show that no such relation existed between Oppenheimer & Co. and Sanderson as that of landlord and tenant, and that the recital in the

Landlord's lien not reserved in sale of land.

note to that effect was not true in point of fact, and that Oppenheimer & Co. were not entitled to a landlord's lien on the cotton in controversy, grown upon said farm by Sanderson; and therefore the constable was not entitled to hold said cotton under the attachment for rent at their instance, as against any one having and showing a right of ownership or of possession.

<div style="margin-left:2em;">Sufficiency of title to maintain replevin.</div>

The evidence further shows that the plaintiff, Smith, purchased the cotton from the owner, Sanderson, for value, and, without stopping to discuss the question whether or not the sale was fully consummated, in all respects, he had such right of possession, at all events, as that he was entitled to maintain and sustain his action for the cotton; and the conduct of his son in intrusting the cotton for the time being to Huey for safe keeping, until plaintiff could be informed of its condition, was no waiver by plaintiff of his right to the same.

<div style="margin-left:2em;">When objection to jurisdiction not sustained on appeal.</div>

It is suggested,—apparently for the first time,—in the argument before us that the record does not show a judgment and affidavit for an appeal from the justice of the peace to the circuit court, and that, therefore, the circuit court was without jurisdiction to hear and determine the cause, and our attention is called to the defective record, in support of this contention. It is true that such are the defects in the record, but it is also true that no objection to it was made in the court below; and, besides, the matter seems to have been heard by consent of the parties. It is also true that consent cannot give jurisdiction of the subject-matter, but it is also a fact that the circuit court had original, as well as appellate, jurisdiction of the subject-matter of this litigation; and its exercise of jurisdiction, under the circumstances, without objection, cannot be questioned here for the first time, and is, besides, within the purview of

the statute, which enables the trial courts to proceed, notwithstanding such defects of record.

The judgment is reversed.